1                  IN THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF UTAH, CENTRAL DIVISION

3


4   SECURITIES AND EXCHANGE COMMISSION,    )

5               Plaintiff,                 )

6     vs.                                  )        Case No.

7   ROGER S. BLISS, an individual, and     )   2:15-CV-98-RJS

8   ROBER S. BLISS d/b/a ROGER BLISS       )

9   AND ASSOCIATES EQUITIES, LLC, a        )

10  Utah Limited Liability Company, d/b/a )

11  ROBER BLISS AND ASSOCIATES CLUB        )

12  LLC, d/b/a BLISS CLUB LLC,             )

13               Defendants.               )

14  _____)

15

16           BEFORE THE HONORABLE ROBERT J. SHELBY

17           --------------------------------------

18                      August 7, 2015

19                     Show Cause Hearing

20

21

22

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP

25  351 South West Temple, #8.431, Salt Lake City, Utah  84101

EXHIBIT

1

1    to present that testimony.  I think it won't be long.  But

2    we've been going some time and our court reporter's fingers

3    fall off if we don't break at least periodically.  Let's try

4    to keep this a brief recess, no more than ten minutes, and

5    we'll come back and finish any testimony and

6    cross-examination, but that will, of course, be limited.

7    And why don't we have a discussion about what follows.  So

8    we'll be in recess.  Thank you.

9              (Recess)

10             THE COURT:  We'll go back on the record.

11             Mr. Washburn.

12             MR. WASHBURN:  Yes, Your Honor.  Mr. Bliss calls

13   Lauren McGee.

14             THE COURT:  Ms. McGee, let's have you take your

15   oath.

16                       LAUREN McGEE,

17           Having been duly sworn, was examined

18                  and testified as follows:

19             THE CLERK:  Please be seated.  Please state and

20   spell your name for the record.

21             THE WITNESS:  Sure.  It's Lauren, L-a-u-r-e-n.

22   Last name McGee, M-c-G-e-e.

23                     DIRECT EXAMINATION

24   BY MR. WASHBURN:

25   Q    Ms. McGee, what do you do for a living?

1    A    I'm an attorney.

2    Q    At which law firm?

3    A    At Clyde Snow and Sessions.

4    Q    And that's the same law firm I work at?

5    A    Yes.

6    Q    Are you counsel of record in this case representing

7 Mr. Bliss?

8    A    Yes, I am.

9    Q    Did you get -- or were you a recipient of an e-mail

10 from Ms. Oliver yesterday identifying witnesses to be called

11 at this hearing?

12    A    Yes. We got her witness list yesterday.

13    Q    Was Mr. Kevin Fortney on that list?

14    A    Amy Oliver had said that she had not heard back from

15 him as he can't be compelled to come in and testify since

16 he's outside of the 100-mile radius, but she was hoping that

17 he would come in, and we're waiting to hear back.

18    Q    Did you at any point yesterday, and that was on

19 August 6th, did you contact Mr. Fortney?

20    A    Yes, we did. We called him.

21    Q    Did you call him more than once or just one time?

22    A    We had several conversations with him back and forth,

23 but we initiated the first call.

24    Q    When you called him the first time, did you ask him to

25 attend here?

1  A    Yes, I did.

2  Q    What did he say?

3  A    He was very hesitant.  He said that he was not

4  interested in testifying.

5  Q    Did he explain why?

6  A    It was going to be a burden on him, and he said he

7  wanted to find a way to be able to help Roger stay out of

8  jail, but he was not willing to come up.

9  Q    Did he talk about any contact he had had with the

10  government before in that context?

11  A    Yes.  He said that he had been interviewed before and

12  he was nervous that things that he said were going to be

13  twisted.

14  Q    Later in the day did Mr. -- in one of these later

15  conversations, did you talk to Mr. Fortney about what he was

16  willing to do to help his brother-in-law, Mr. Bliss?

17  A    Yes.  He said that he was willing to go and purchase

18  the boat back that he had sold to Brett Johnston.  He said

19  that he was going to find a way.  He wanted to be able to

20  help keep his brother-in-law out of jail.

21  Q    At any point during those conversations did you talk to

22  Mr. Fortney about whether he maintained that he had an

23  ownership interest in the boat?

24  A    Yes.  He said it was his at all times.

25  Q    Including until the day he sold it?

1    A    Up until the day he sold it, which was in July, to

2    Mr. Brett Johnston.

3    Q    Did he tell you whether he had negotiated a deal to buy

4    that boat back?

5    A    Yes, he did.  So later on he said that he had

6    negotiated to purchase the boat back from Mr. Johnston at

7    the same price that he had sold it for.

8    Q    Which was $12,800; is that right?

9    A    $12,800, yes.

10   Q    Did you have a conversation with Mr. Fortney when he

11   was on the road from his house in St. George down to

12   Phoenix?

13   A    Yes.  He called us and let us know that he had received

14   a call from Mr. Johnston telling him that he can't sell him

15   the boat anymore, that he had received instructions by

16   someone at the SEC who said that if he sold the boat, he

17   would get in trouble, so he wasn't comfortable doing that.

18   So Kevin -- I'm sorry.

19   Q    Just so we're clear, the he there, that wasn't

20   Mr. Fortney, that was what Mr. Johnston had told

21   Mr. Fortney?

22   A    Yes, that's correct.

23   Q    Did you subsequently contact Mr. Fortney?

24   A    We subsequently --

25   Q    I'm sorry.  Mr. Johnston.

1    A    Yes, we did.

2    Q    And Mr. Johnston, what did he tell you?

3    A    He told us that he -- after he had been contacted by

4    Mr. Fortney, that he had contact -- that Mr. Johnston

5    reached out to the attorney at the SEC, who told him about

6    the pending hearing that was going on today and that he was

7    instructed not to sell the boat back.

8    Q    Did you ask him to identify the attorney that he talked

9    to at the SEC?

10   A    Yes, we did, and he was not willing to give us that

11   information.

12   Q    Did he ask Mr. Johnston to prepare -- well, to appear

13   at the hearing today or to prepare a declaration for today's

14   hearing?

15   A    Well, we asked him -- he seemed not too thrilled that

16   we were calling him.  We didn't specifically ask him to

17   appear.  Toward the end of the phone call, when he was about

18   to terminate it, he was just -- he just wanted to stay out

19   of it.

20   Q    He told you he wanted to stay out of it from there?

21   A    Yeah.

22   Q    Did he tell you what you could do if you had further

23   questions, like who you should contact?

24   A    That we could contact the SEC if we had any further

25   questions about the conversation that he had with someone at

1    the SEC.

2    Q    Do you know -- did Mr. Fortney tell you what

3    preparations, if any, he had taken to buy the boat back?

4    A    Yes.  He said that he obtained cash in the amount of

5    12,800 or $13,000, and that he had negotiated that purchase

6    price with Mr. Johnston, and had started the drive down to

7    Arizona, I believe Phoenix, to obtain the boat.

8    Q    Did Mr. Fortney tell you what his intent was -- what

9    his intent was to do with the boat once he purchased the

10   boat?

11   A    Yes.  He said that his intent was to get the boat back

12   and bring it up so that the boat is accessible to the

13   receiver, so that Roger Bliss could stay out of jail.

14   Q    When you say bring it up, what do you mean?  Bring it

15   up to Salt Lake City?

16   A    I believe so.

17   Q    Did he give you any time frame for when he thought he

18   could have the boat here in Salt Lake City?

19   A    He said by Saturday, tomorrow.

20           MR. WASHBURN:  Your Honor, that's all I have.

21   Thank you.

22                    CROSS-EXAMINATION

23   BY MS. OLIVER:

24   Q    Were you the only one that was on these phone calls

25   with Mr. Fortney?

1   A    No, I wasn't.  Jennifer James was on all of the calls

2   with me.

3   Q    So all of the calls had both you and Ms. James present?

4   A    Yes.

5   Q    Was anyone else present with Mr. Fortney.

6   A    I believe that a few of the calls Mr. Washburn was

7   present as well, just with Kevin Fortney.

8   Q    How many calls would you say you had with Mr. Fortney

9   yesterday?

10  A    I would say around five or six calls throughout the

11  day, just back and forth.

12  Q    When was the last time you spoke to Mr. Fortney?

13  A    It was after five o'clock yesterday evening.

14  Q    And you don't represent Mr. Fortney, correct?

15  A    No, we don't.

16  Q    And you don't have any control over him; isn't that

17  correct?

18  A    That's correct.

19  Q    Did he tell you what he did with the money that he

20  received when he sold the boat, the $12,800?

21  A    He said that in order to make ends meet and pay bills,

22  pay off credit cards and things, and just monthly bills that

23  came up, he used the money for that.

24  Q    But he managed to come up with, yesterday, $12,800 in

25  cash?

1    people who sell these kinds of boats.

2            So let's not worry about the logistics of moving

3    the boat around.  It's exactly where it should be.  And that

4    means that people can work -- can get things done more

5    quickly because there's less to get done.  We don't have to

6    worry about the logistics of a trailer.  It's just will two

7    people quitclaim to the receiver any interest that they

8    have, and that shouldn't take very long.  Then we can tell

9    Mr. Johnston to go ahead and sell it.

10           I think Mr. Fortney needs to send the $12,800 back

11   to the receiver.  The person who's going to be out that is

12   the buyer, Mr. Johnston.  We would rather have the cash

13   back.  If Mr. Johnston sells it, he takes the first 12,800

14   out of the sales proceeds, and then everyone is whole.  I

15   think it can happen fairly quickly.

16           That doesn't answer Your Honor's question, which

17   is very deep, what is the remedy if somebody throws the ball

18   out of the ballpark.  And all I want is title.

19           THE COURT:  Understood.  All right.

20           With apologies to all of you, and I don't mean to

21   test your patience, we're going to take another short

22   recess.

23           Mr. Bliss, don't leave the courthouse.

24           MR. WASHBURN:  Your Honor, may I just have one

25   minute to address something that came up there?

```
 1                    C E R T I F I C A T E

 2

 3

 4          I hereby certify that the foregoing matter is

 5   transcribed from the stenographic notes taken by me and is a

 6   true and accurate transcription of the same.

 7

 8

 9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 8-20-15
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25
```